Richard KESSLER, Plaintiff–
Appellant,

v.

WESTCHESTER COUNTY DEPART-
MENT OF SOCIAL SERVICES and
Westchester County, Defendants–Ap-
pellees.

Docket No. 05–2582–cv.

United States Court of Appeals,
Second Circuit.

Argued: Jan. 6, 2006.

Decided: Aug. 23, 2006.

Antonia Kousoulas, New York, N.Y. (Kousoulas & Associates, New York, NY), for Plaintiff–Appellant.

Joseph A. Saccomano, Jr., White Plains, N.Y. (Susanne Kantor, Jackson Lewis, White Plains, NY, Charlene M. Indelicato, Westchester County Attorney, on the brief), for Defendants–Appellees.

Before FEINBERG, KEARSE, and RAGGI, Circuit Judges.

KEARSE, Circuit Judge.

Plaintiff Richard Kessler appeals from a judgment of the United States District Court for the Southern District of New York, Charles L. Brieant, *Judge*, summarily dismissing his complaint ("Complaint")

alleging that defendants Westchester County (the "County") and its agency Westchester County Department of Social Services ("DSS") violated his rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* ("ADEA"), by transferring him to a less desirable employment post and changing his responsibilities in retaliation for Kessler's filing of charges of discrimination pursuant to Title VII and the ADEA. The district court granted defendants' motion for summary judgment dismissing those claims on the ground that Kessler, who conceded that the transfer had not effected any change in his salary, benefits, job title, grade, or hours of work, failed to show that he had suffered an adverse employment action. On appeal, Kessler contends that he had adduced evidence sufficient to create a genuine issue of fact to be tried as to whether the changes in his employment were materially adverse, and that summary judgment was thus inappropriate. In light of the Supreme Court's recent decision in *Burlington Northern & Santa Fe Railway Co. v. White,* —— U.S. ——, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), we agree.

## I. BACKGROUND

Taken in the light most favorable to Kessler, as the party against whom summary judgment was granted, the record, which includes Kessler's affidavit and his deposition testimony, as well as depositions of various DSS officials, indicates the following.

Kessler, employed by the County since 1977, has been assigned to DSS since October 1983 in the permanent civil service position of Assistant Commissioner of Social Services. From 1983 until April 2003, Kessler was assigned to work in DSS offices located in White Plains, New York. Except for three years of that period when he headed DSS's Office of Child Support Enforcement, Kessler was assigned to DSS's central administrative office, where the DSS Commissioner and senior staff members had their offices.

During the period October 1983 to April 2003, Kessler's duties included broad departmental responsibilities such as negotiating contracts on behalf of DSS; developing new departmental program initiatives; designing and implementing training programs for lower-level employees and programs to train outside vendors to perform functions in the manner desired by DSS; and acting as a liaison with Pace University in a management training fellowship program. At times Kessler supervised upwards of 100 DSS employees. He managed broad program areas, as to which he reported directly to the Commissioner or a Deputy Commissioner.

### A. *Kessler's Past Claims of Discrimination*

In June 2002, Kessler, a white, Jewish male born in 1945, filed with the New York State Division of Human Rights ("NYSDHR") and the United States Equal Employment Opportunity Commission ("EEOC") a complaint against the County and DSS ("First SDHR Complaint"). Kessler charged principally that, beginning in 1997, defendants had denied him "equal terms, conditions and privileges of Employment" on account of his age, race, gender, and religion, in violation of, *inter alia,* Title VII and the ADEA (First SDHR Complaint ¶ 10 *et seq.*), by denying him promotions and other privileges of employment that had been granted to his "younger or non-Jewish or non-White or Female" counterparts (*id.* ¶ 3). In August 2002, Kessler's "immediate supervisor, Fred Broege, [a] First Deputy Commissioner, ... told [Kessler] that as a result of filing the NYSDHR complaint, [Kes-

sler's] loyalty to DSS was in question and that senior staff members were concerned that [Kessler] was not a part of the team and could not be trusted." (Affidavit of Richard Kessler dated March 24, 2005 ("Kessler Aff."), ¶ 10.)

The EEOC notified Kessler, by letter dated January 3, 2003, of its decision not to bring suit on his behalf with respect to his ADEA claim, stating that that decision did not affect his right to sue and that EEOC permission to sue was not required with respect to that claim. By letter dated January 15, 2003, the EEOC issued Kessler a right-to-sue letter on his Title VII claim. In February 2003, Kessler discussed his discrimination charges and the EEOC letters with William Ryan, a member of the County's Board of Legislators, who informed him shortly thereafter that Kessler's charges had been discussed with the DSS Commissioner. (See Kessler Aff. ¶¶ 15–16; Deposition of William Ryan at 10, 12, 17–18, 21–26.) On March 4, 17, and 26, 2003, in connection with his discrimination charges, Kessler submitted Freedom of Information Law requests to the Office of the Commissioner of DSS, seeking information as to DSS's promotion practices and documents pertaining to the position taken by defendants in his NYSDHR proceeding.

On March 18, 2003, Kessler's role in implementing a human resources training initiative called the Leadership Transformation Group was "summarily curtailed" (Deposition of Richard Kessler ("Kessler Dep.") at 68–69), and he was instructed not to attend an upcoming meeting on that project (see id. at 185–87). He was soon also relieved of his other training duties, including acting as liaison with Pace University in the management fellowship program. (See id. at 197–200.)

On April 2, 2003, Kessler was informed that he was being transferred from DSS's central administrative office in White Plains to the DSS district office in Yonkers, New York. He asserts that Jewru Bandeh, DSS Deputy Commissioner since 1998, who informed him of the transfer,

> refused to discuss or provide me with a statement of my assignment and duties in Yonkers. Upon arriving at Yonkers, Associate Commissioner Lee Jacobs, who headed the office, told me that he had not requested my services and that I was re-assigned because "they wanted you out of White Plains."

(Kessler Aff. ¶ 19.) The transfer did not affect Kessler's job title, job grade (which was 15), salary, benefits, or hours of work. However, as described in greater detail in Part I.B. below, Kessler found that he had been stripped of his prior responsibilities, which were replaced by menial tasks.

## B. The Present Claims of Retaliation

Some seven months after his transfer to Yonkers, Kessler filed a new complaint with NYSDHR charging DSS with transferring him in retaliation for filing his June 2002 discrimination charges and for making his subsequent requests for information in connection with those charges ("Second SDHR Complaint"). After completing that administrative proceeding, Kessler commenced the present action, alleging that his transfer to Yonkers constituted "a de-facto demotion" (Complaint ¶ 22) that was intended by defendants to punish him for his prior charges of discrimination (see id. ¶¶ 26, 27).

Following a period of discovery that included Kessler's deposition and the depositions of Bandeh, Jacobs, and other DSS officials, defendants moved for summary judgment dismissing Kessler's Complaint, on the grounds, inter alia, that Kessler lacked a good faith, reasonable belief that the actions challenged in his initial discrimination charges were unlawful; that Kessler's assignment to Yonkers did not

constitute an adverse employment action; and that there was no causal connection between Kessler's charges of discrimination and his transfer. Defendants also contended that they had proffered legitimate business reasons for Kessler's transfer, which Kessler failed to rebut.

In opposition to the motion, Kessler submitted, *inter alia,* the official DSS job description for the class of positions called Assistant Commissioner of Social Services, which stated as follows:

> Under the general direction of the Commissioner of Social Services or Deputy Commissioner, *an incumbent of this position is responsible for the development of program policies and procedures or the direction and control of a large segment of the Department's field operations.* This position has overall responsibility for policy formulation, resource allocation, planning and evaluation of programs and procedures, financial and personnel management. *This class functions as part of the top management of the Department* and is responsible and accountable for the analysis of proposed State and Federal legislation and regulations, Departmental alternatives and impact, and makes recommendations to the Commissioner and Executive staff. This class differs from Deputy Commissioners in that *wide latitude and independent judgment is exercised over a significant portion of the Department's operation* while Deputy Commissioners may act for the entire Department. *Supervision is exercised over a large number of managerial, professional and clerical support staff.*

(Exhibit 9 to Deposition of Jewru Bandeh ("DSS Job Description") (emphases added).) In his own deposition, Kessler testified that although he had performed the above duties prior to April 2003, upon his transfer to Yonkers he was, *inter. alia,* relieved of his training duties (*see* Kessler Dep. at 197–200) and relieved of responsibility for developing and implementing new program initiatives and for representing DSS in initiating and maintaining relationships with outside consultants and vendors (*see id.* at 340–42). In addition, he no longer reported directly to a DSS First Deputy Commissioner or interacted with the Commissioner (*see id.* at 107, 190, 227–28); he was excluded from managerial meetings of the sort he had previously attended (*see id.* at 106–07); and in Yonkers, he was required to report to a supervisor who was of the same civil service grade as Kessler, rather than to higher-level supervisors such as those to whom he had reported prior to filing his First SDHR Complaint in June 2002 (*see id.* at 334–35).

Kessler also submitted his affidavit, further detailing ways in which the transfer to Yonkers changed the nature of his job. For example, whereas in White Plains he had at times supervised "upwards of ... 100 staff members" (Kessler Dep. at 341), upon his transfer to Yonkers he supervised no one (Kessler Aff. ¶ 20), and his assigned tasks were menial:

> 20. During my first year in the Yonkers District Office, I did not supervise any employees; I had no support or clerical staff assigned to me; I reported exclusively to Associate Commissioner Lee Jacobs and not to the Commissioner or any Deputy Commissioner; and I was assigned exceptionally limited and amorphous assignments and tasks that did not in any way involve broad departmental responsibilities....

> 21. During my first year in the Yonkers District Office, I was assigned tasks such as contacting hospitals and reporting back to Jacobs; obtaining listings of scheduled unit meetings; updating an employment matrix. Some of these tasks had previously been per-

formed by lower level line managers. An administrative assistant and two supervising eligibility examiners (non-managers), Grade 11, were assigned to work along side me in connection with some of these assigned tasks, not as my subordinates, but as my peers.

(*Id.* ¶¶ 20–21; *see also* Deposition of Lee Jacobs ("Jacobs Dep.") at 65 (other staff members were directed to work with Kessler, but not to report to him).) When Kessler updated the "employment matrix," no one was assigned to assist him, and he was forced to perform data entry tasks himself. (*See* Jacobs Dep. at 66–67.)

Given the DSS Job Description and his sworn statements as to the ways in which the substance of his job had been dramatically altered by the transfer, Kessler argued that there was a genuine issue to be tried as to, *inter alia,* whether the transfer effected change that was materially adverse.

## C. *The Ruling of the District Court*

The district court, in a Memorandum and Order dated April 20, 2005, *see Kessler v. Westchester County Department of Social Services,* No. 04 Civ. 5752, 2005 WL 1023222 (S.D.N.Y. Apr.20, 2005) ("District Court Opinion"), granted defendants' motion for summary judgment. The court stated that, in order to make out a prima facie case of retaliation under either the ADEA or Title VII, a

[p]laintiff must prove (1) that he engaged in protected activity; (2) that defendant was aware of this participation; (3) that Plaintiff suffered an adverse employment action; and (4) that a causal connection exists between the protected activity and the adverse employment action.

District Court Opinion, 2005 WL 1023222, at *2. Without discussing all of these elements, the court concluded that summary judgment was appropriate because Kessler had not adduced sufficient evidence to show that he had suffered an adverse employment action.

Citing and quoting decisions of this Court, the district court stated that

[a]n adverse employment action is a materially adverse change in the terms and conditions of employment and includes "termination, demotion evidenced by a decrease in salary or wage, a less distinguished title, a material loss in benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." See Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir.2004). There must be more than mere inconvenience or an alteration of job responsibilities. See Galab[ ]ya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2000). The ADEA protects an employee against reprisals that do not reach the level of a termination or reduction in wages or benefits, but the employer's action must still be "sufficiently deleterious" to the Plaintiff's current or future employment to constitute an adverse employment action. See Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir.1997) ("minor, ministerial stumbling blocks" are insufficient to constitute adverse employment actions).

District Court Opinion, 2005 WL 1023222, at *2 (emphases ours). The court stated that "an internal transfer .... *may* be an adverse employment action if it is accompanied by a negative change in the terms and conditions of employment," *id.* (citing *Morris v. Lindau,* 196 F.3d 102, 113 (2d Cir.1999)) (emphasis in District Court Opinion), but that

"[a] purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action ... [;] to be adverse, change

in work assignment must cause materially significant disadvantage[;] ... *the key inquiry regarding involuntary transfers is whether the transfer constitutes a negative employment action tantamount to a demotion.*" District Court Opinion, 2005 WL 1023222, at *3 (quoting *Galabya v. New York City Board of Education,* 202 F.3d at 641) (internal quotation marks omitted) (emphasis ours).

Noting that Kessler "admits that he was never disciplined, suspended, [or] written up and that his salary, benefits and hours of work were not decreased in any way," and that Kessler "has never received an unsatisfactory evaluation," the court stated that "[i]t is clear that the traditional indices of adverse employment actions amounting to retaliation are not present," and that Kessler "did not suffer an adverse employment action." District Court Opinion, 2005 WL 1023222, at *2. The district court saw "no evidence that the transfer in this case was anything other than a pure lateral transfer between various offices within the discretion of the employer and responsive to its perceived needs," *id.* at *3, and ruled that the transfer was therefore a "mere administrative change[ ], and not a *de facto* demotion," *id.* The court concluded that

> [t]he evidence belies Plaintiff's assertion that he was transferred to an inferior position in Yonkers in which he had less responsibility. Plaintiff's personal dissatisfaction with his current position in Yonkers and his belief that his skills and qualifications are underutilized do not create jury issues as to whether his transfer was adverse.... Accordingly, the Court concludes that Mr. Kessler has not suffered an adverse employment action as a result of the transfer.

*Id.* at *4.

Judgment was entered dismissing the complaint, and this appeal followed.

## II. DISCUSSION

On appeal, Kessler contends that the district court erred in ruling that he had not adduced evidence sufficient to create a genuine issue to be tried as to whether he suffered an adverse employment action. In light of the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White,* —— U.S. ——, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (*"White"*), rendered subsequent to the district court's decision in this case, we agree. We also reject defendants' contention that the dismissal of Kessler's claims should be affirmed on alternative grounds.

### A. *The Elements of a Retaliation Claim and the Standard of Review*

Title VII forbids an employer to retaliate against an employee for, *inter alia,* complaining of employment discrimination prohibited by Title VII:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). The ADEA contains a nearly identical provision prohibiting retaliation for complaining of employment discrimination on the basis of age, *see* 29 U.S.C. § 623(d), and the same standards and burdens apply to claims under both statutes, *see, e.g., Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003).

 In order to present a prima facie case of retaliation under Title VII or the ADEA, a plaintiff must adduce

> evidence sufficient to permit a rational trier of fact to find [1] that [ ] he en-

gaged in protected participation or opposition under Title VII [or the ADEA], [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

*Cifra v. General Electric Co.,* 252 F.3d 205, 216 (2d Cir.2001) (*"Cifra"*) (internal quotation marks omitted); *see, e.g., Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir.2005); *Terry v. Ashcroft,* 336 F.3d at 141; *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998).

In ruling on a motion for summary judgment, the district court is required to "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Cifra,* 252 F.3d at 216. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> [T]he issue of material fact required ... to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.

*Id.* at 248–49, 106 S.Ct. 2505 (internal quotation marks omitted). The same standards apply on appellate review of a grant of summary judgment. *See, e.g., Cifra,* 252 F.3d at 216.

### B. The Adverse–Action Element of a Retaliation Claim

Title VII's core substantive anti-discrimination provision makes it an unlawful employment practice

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify ... employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). The ADEA sets forth similar prohibitions with respect to discrimination on the basis of age. *See* 29 U.S.C. §§ 623(a)(1) and (2).

With respect to claims that an employer has violated these core provisions by taking an adverse employment action for discriminatory reasons against a member of a protected class, *see generally de la Cruz v. New York City Human Resources Administration Department of Social Services,* 82 F.3d 16, 20 (2d Cir.1996) (*"de la Cruz"*), we have stated that "a transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career," *Galabya v. New York City Board of Education,* 202 F.3d 636, 641 (2d Cir. 2000) (*"Galabya"*). We have also ruled that an adverse employment action may be found where the plaintiff was transferred from an " 'elite' " unit to one that was "less prestigious," *de la Cruz,* 82 F.3d at 21, or where the transfer effected a "radical change in nature of the [plaintiff's] work," *Rodriguez v. Board of Education of East-*

chester Union Free School District, 620 F.2d 362, 366 (2d Cir.1980).

But we have generally looked to whether the plaintiff has suffered "a materially adverse change in h[is] employment status" or in the terms and conditions of his employment, Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir.2004) ("Williams"):

> Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2000) (ellipsis in original) (citations omitted). As these examples suggest, "[t]o be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (citation and internal quotation marks omitted). Moreover, we have held that an involuntary transfer may constitute an adverse employment action if the plaintiff "show[s] that the transfer created a materially significant disadvantage" with respect to the terms of her employment. Id. at 641 (citation and internal quotation marks omitted).

Williams, 368 F.3d at 128 (emphases added).

We have adopted this standard in several cases addressing claims of ADEA- and Title VII-prohibited retaliation. See, e.g., Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir.2005) ("Fairbrother"); Richardson v. New York State Department of Correctional Service, 180 F.3d 426, 446 (2d Cir. 1999) ("Richardson"). With respect to the retaliation claim at issue in Richardson, for example, we stated that "a plaintiff may suffer an adverse employment action if she endures a materially adverse change in the terms and conditions of employment." Id. at 446 (internal quotation marks omitted). In Fairbrother, we stated that "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment," 412 F.3d at 56 (internal quotation marks omitted), and that

> "[i]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action,"

id. (quoting Williams, 368 F.3d at 128) (other internal quotation marks omitted). We stated that "a transfer" that does not change the conditions of employment is " 'a mere inconvenience or an alteration of job responsibilities,' and hence [is] not 'materially adverse.' " Fairbrother, 412 F.3d at 56 (quoting Galabya, 202 F.3d at 640).

C. *The Supreme Court's Decision in White*

■ In White, the Supreme Court announced a different standard. The White Court ruled that "the anti-retaliation provision [of Title VII], unlike [Title VII's] substantive provision, is *not* limited to discriminatory actions that affect the terms and conditions of employment." 126 S.Ct. at 2412–13 (emphasis added). Rather, to prevail on a claim for retaliation under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (internal quotation marks omitted).

The plaintiff in *White* had been hired by the defendant Burlington as a railroad "track laborer," a job that entailed removing and replacing track components, transporting track material, cutting brush, and clearing litter and cargo spillage from the right-of-way. Some facets of that job involved operation of a forklift. White was soon assigned to operate the forklift, and while she also performed some of the other track laborer chores, operation of the forklift became her primary responsibility. After she complained to Burlington officials about sexual harassment by her male supervisor, however, White was relieved of forklift duty and assigned to perform only other track laborer tasks. White sued, asserting a claim of retaliation, and a jury found in her favor. The district court denied a posttrial motion by Burlington for judgment dismissing White's claim as a matter of law, a denial that was ultimately affirmed by the court of appeals sitting en banc, and the Supreme Court affirmed.

The Supreme Court noted that both Burlington and the Solicitor General of the United States, appearing as amicus curiae, contended that there should be

> a link between the challenged retaliatory action and the terms, conditions, or status of employment. They note that Title VII's substantive anti-discrimination provision protects an individual only from employment-related discrimination. They add that the anti-retaliation provision should be read *in pari materia* with the anti-discrimination provision. And they conclude that the employer actions prohibited by the anti-retaliation provision should similarly be limited to conduct that "affects the employee's 'compensation, terms, conditions, or privileges of employment.'" Brief for United States as *Amicus Curiae* 13 (quoting § 2000e–2(a)(1)); see Brief for Petitioner 13 (same).

126 S.Ct. at 2411. But, noting the differences between the language of Title VII's substantive prohibition, which refers expressly to an employee's "compensation, terms, conditions, or privileges of employment," and the language of its retaliation prohibition, which contains no such reference, the Court concluded, "We cannot agree." *Id.*

Observing that Title VII's primary goal is to promote "a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status," the Court pointed out that "[t]he anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Id.* at 2412. The Court reasoned that the means by which an employer can retaliate against an employee are not limited to altering his compensation, terms, conditions, or privileges of employment, and that

> [a] provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the anti-retaliation provision's primary purpose, namely, [m]aintaining unfettered access to statutory remedial mechanisms. . . .
>
> Thus, purpose reinforces what language already indicates, namely, that *the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.*

*Id.* at 2412–13 (internal quotation marks omitted) (emphasis added).

The Court thus rejected Burlington's contention that the reassignment of White could not be considered materially adverse because her "former and present duties f[e]ll within the same job description," *id.*

at 2416. The Court concluded that White's evidence that her tasks after reassignment were dirtier, more arduous, and less prestigious sufficed to support the jury verdict in her favor. "Based on this record, a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee." *Id.* at 2417.

The Court cautioned that "reassignment of job duties is not automatically actionable," *id.*, and that the standard for assessing such a reassignment is an objective, rather than a subjective, one, *see id.* at 2415("We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective." (emphasis in original)). "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 2417 (internal quotation marks omitted). Thus, the Court summarized:

> We conclude that the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. We also conclude that the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

*Id.* at 2409.

D. *Application of* White *to the Present Case*

■ Applying the *White* standard to the present case, we conclude that Kessler presented evidence sufficient to create a genuine triable issue as to whether the reassignment to which he was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination. The evidence described in Parts I.A. and B. above, viewed in the light most favorable to Kessler, shows that prior to his transfer to Yonkers, Kessler had responsibilities and performed functions as set out in the official DSS description of the job of an Assistant Commissioner, and that upon his transfer to Yonkers, although he retained the title of Assistant Commissioner, he was stripped of those responsibilities and not allowed to perform ·those functions. Thus, whereas he previously "ha[d] overall responsibility for policy formulation, resource allocation, planning and evaluation of programs and procedures, financial and personnel · management" (DSS Job Description), in Yonkers he no longer had any such responsibilities. Whereas he had been "[u]nder the general direction of the Commissioner of Social Services or Deputy Commissioner" (DSS Job Description), he no longer reported to them but instead reported to a supervisor whose grade level was no higher than his. Whereas his job had been to "function[ ] as part of the top management of the Department" (DSS Job Description), he was no longer given any managerial assignments and was not even allowed to attend meetings of lower-level managers. Whereas he had "[s]upervis[ed] . . . a large number of managerial, professional and clerical support staff" (DSS Job Description), upon his transfer to Yonkers he in fact was allowed to supervise no one. He was required to undertake clerical tasks and to perform data entry alongside employees several grades below his.

From this evidence, a rational factfinder could permissibly infer that a reasonable employee in the position of DSS Assistant Commissioner could well be dissuaded from making a charge of discrimination if

doing so would result in a transfer to an office in which, *inter alia,* he would not be allowed to perform the broad discretionary and managerial functions of that position, no one would report to him, and he would be forced to do work normally performed by clerical and lower-level personnel. We conclude that summary judgment on the basis that Kessler failed to adduce evidence that his reassignment was materially adverse was inappropriate.

### E. *Defendants' Suggested Alternative Grounds for Affirmance*

Defendants argue that if we do not uphold the grant of summary judgment on the ground adopted by the district court, we should affirm on the basis (a) that Kessler lacked a good faith, reasonable belief that his First SDHR Complaint challenged conduct that was unlawful, or (b) that there was no causal connection between his reassignment and any prior protected activity, or (c) that Kessler has not rebutted defendants' proffer of legitimate reasons for his reassignment. We conclude that the record described in Parts I.A. and B. above includes evidence sufficient to defeat summary judgment against Kessler on any of these grounds.

■ As to the "protected activity" element of a Title VII or ADEA retaliation claim, the plaintiff need only "have had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII [or the ADEA]." *McMenemy v. City of Rochester,* 241 F.3d 279, 285 (2d Cir.2001). The district court correctly found that Kessler met this standard, *see* District Court Opinion, 2005 WL 1023222, at *2, and defendants' contention to the contrary is frivolous. Kessler's First SDHR Complaint alleged, *inter alia,* that defendants had denied him "equal terms, conditions and privileges of Employment by denying me a promotion because of my Age, Race, Sex[, and] Creed"

(First SDHR Complaint ¶ 10), while granting such promotions and other privileges of employment to his "younger or non-Jewish or non-White or Female" counterparts (*id.* ¶ 3). Plainly Kessler challenged employment practices that, if proven, were unlawful under Title VII and the ADEA.

■ As part of their contention that there was no causal connection between Kessler's prior complaints of discrimination and his being transferred to Yonkers and stripped of his normal duties, defendants argue, *inter alia,* that the decision to transfer Kessler was made by Bandeh and that Bandeh was unaware of Kessler's discrimination complaints. Even if its factual premise is true, this argument need not detain us long. "Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." *Gordon v. New York City Board of Education,* 232 F.3d 111, 116 (2d Cir.2000) (*"Gordon"*). Plainly DSS knew of Kessler's First SDHR Complaint: it made submissions to NYSDHR in opposition. *See* NYSDHR Determination and Order After Investigation, dated March 24, 2004, at 1, 2.

Further undercutting defendants' contention that there is no proof as to causation, the record includes evidence that the treatment that Kessler contends reflected defendants' retaliatory animus followed closely on the heels of his protected activity. *See generally Cifra,* 252 F.3d at 217; *Gordon,* 232 F.3d at 117. For example, Kessler filed his First SDHR Complaint in June 2002; in August 2002, his then-supervisor, a DSS First Deputy Commissioner, questioned his loyalty "as a result of filing the NYSDHR complaint" (Kessler Aff. ¶ 10). In addition, Kessler made a request for information to support his discrimination claim on March 17, 2003; on March

18, he was stripped of his responsibility for implementing a training program he had designed and told not to attend the upcoming meetings. On March 26, he made a follow-up request for information; on April 2, he was transferred to Yonkers and stripped of all of his prior supervisory, developmental, and managerial duties.

 Finally, we reject defendants' contention that we may affirm on the basis that Kessler's transfer to Yonkers was prompted by legitimate budgetary concerns requiring DSS to "utilize its staff in new ways and modify management roles during this period of fiscal constraint" (Defendants' brief on appeal at 35 (internal quotation marks omitted)), and by Bandeh's assessment that the Yonkers office "could use Kessler's skills" *(id.)*. *See generally Cifra,* 252 F.3d at 216 (where the plaintiff has adduced evidence sufficient to constitute a prima facie case, and the employer has articulated a legitimate nonretaliatory reason for the adverse action, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation). Although the concerns advanced by defendants would be legitimate nondiscriminatory reasons for a transfer, Kessler adduced evidence that, if credited, could support the conclusion that the reasons proffered are pretextual. According to Kessler, his skills were not in fact utilized in Yonkers; and he states that Jacobs, his supervisor in Yonkers, told him that his skills were neither requested nor needed in the Yonkers office and that he was transferred simply in order to remove him from White Plains. Thus, the facts pertaining to defendants' proffer of a nonretaliatory reason for Kessler's transfer are in dispute, and their resolution is a matter for the jury.

## CONCLUSION

We have considered all of defendants' arguments in support of summary judgment and have found them to be without merit. The judgment of the district court is vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.