**Reversed and Rendered and Memorandum Opinion filed July 9, 2024.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-23-00178-CV

---

### CITY OF HOUSTON, Appellant

### V.

### LESLIE G. WILLS, Appellee

---

**On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Cause No. 2020-45680**

---

## MEMORANDUM OPINION

Appellee Leslie Wills filed suit against appellant the City of Houston, alleging her supervising lieutenant discriminated against her based on her sex and she was subjected to adverse employment actions in retaliation for having complained about the alleged discrimination. *See* Tex. Lab. Code Ann. §§ 21.001–.556. The City filed a plea to the jurisdiction, which the trial court denied.

In three issues in this interlocutory appeal, the City argues the trial court erred by striking two of the City's exhibits (issue 1) and denying the City's plea to

the jurisdiction on Wills's discrimination and retaliation claims, respectively (issues 2 and 3). Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8). Concluding that (1) Wills has not provided prima facie evidence that she suffered an adverse employment action for both her discrimination and her retaliation claims and (2) Wills did not overcome the City's nondiscriminatory reasons for any allegedly unequal treatment she received, we reverse and render judgment dismissing the case for want of subject-matter jurisdiction.

## I. BACKGROUND

As of 2017, Wills had been the mounted patrol administrative sergeant in the Houston Police Department (HPD) for 10 years. Wills was responsible for the acquisition, retirement, health, and assignment of horses, in addition to general control over barn operations and officer training. In late 2017, Lieutenant Dean Thomas was appointed as the new mounted patrol commander. Thomas began implementing changes with respect to officer training, retirement of horses, and the policy on use of spurs. Wills perceived that Thomas was disregarding her expertise and experience at mounted patrol; Thomas was concerned that Wills was undermining his authority and disobeying direct orders. As a result, Thomas instructed Wills that she was no longer to have any decision-making authority regarding the assignment, retirement, or acquisition of horses. Two days later, Wills prepared a letter to the chief of police alleging that Thomas had subjected her to a hostile work environment and gender bias.

Despite HPD sending Thomas and Wills to mediation, the two continued to disagree on how to manage the barn. Because of continued tension between the two, Captain Ernest Garcia—the HPD captain with oversight of the mounted patrol—met with Thomas and Wills. Wills indicated that she and Thomas continued to have "adversity in their relationship" because she wanted to do things

2

one way and Thomas wanted to do things another way. While acknowledging Wills's experience, Garcia reminded Wills of the chain of command, meaning that Thomas was in charge. Garcia advised Wills that if conflicts and pushbacks continued, changes would be made in the mounted patrol. However, according to officers in the mounted patrol that spoke with Garcia, Wills continued to act "like the de facto commander, which was negatively impacting the unit as the officers did not know whose orders to follow." Because Thomas could not trust Wills to accept and follow his authority, Thomas reassigned Wills—with Garcia's approval—from administrative sergeant to patrol sergeant, but she remained in mounted patrol.

After the reassignment, Wills complained about on-going harassment and retaliation by Thomas. HPD immediately put a shielding plan into effect, temporarily relocating Thomas to a different unit and ordering him to have no contact with Wills. HPD's internal affairs division investigated Wills's complaints, ultimately finding insufficient evidence to prove or disprove that Thomas's actions rose to the level of creating a hostile work environment, workplace harassment, discrimination, or gender bias. Regardless, Thomas was permanently reassigned to another division, and Wills has had no contact with Thoms since the shielding plan was put into effect in 2018.

The new administrative sergeant of mounted patrol, Jeff Dobrucki, claimed that Wills was causing tension in response to a scheduling change Thomas had implemented. Dobrucki also claimed that several officers in mounted patrol told him that they felt threatened and personally targeted because of two posters Wills had recently hung in her cubicle.[1] HPD decided that it was "in the best interest of

---

[1] One poster read, "If you betray me at my weakest, don't expect mercy when I'm at my strongest"; the other stated, "It's mercy, compassion and forgiveness I lack[,] not rationality."

3

the Department" to involuntarily transfer Wills, and two other male sergeants, from mounted patrol to other divisions. Wills was given the option to transfer to any division with an existing vacancy. After initially transferring to downtown patrol, Wills initiated a voluntary transfer to the downtown security detail just a few weeks later—all while retaining her same rank and pay scale.

In August 2018, Wills received a "Report of Employee Efficiency Rating," which provided additional details regarding her involuntary transfer from mounted patrol. The report mentioned that conflicts with authority and difficulty following the chain of command appear to be "a pattern of behavior with Sergeant Wills, who also struggled to comply with changes implemented by the previous lieutenant, Diana Poor." The report concluded: "While Sergeant Wills clearly has a lot of experience with horses, any such strengths are eclipsed by the disruption she caused in the unit by causing dissention [sic], refusing to change, adapt, or follow the directives of her supervisors."

Wills initiated a grievance because of the involuntary transfer, asking to be reinstated as the administrative sergeant for the mounted patrol; her grievance was denied. Several months later, in early 2019, Wills resigned from HPD.

In 2020, Wills filed suit against the City alleging discrimination and retaliation in violation of Labor Code chapter 21. *See* Tex. Lab. Code Ann. § 21.051. The City filed a plea to the jurisdiction and no-evidence motion for summary judgment. On February 23, 2023, the trial court signed an order denying the City's plea to the jurisdiction. The City filed this interlocutory appeal.

## II.   ANALYSIS

### A.   Standard of review and applicable law

We review a trial court's ruling on a plea to the jurisdiction de novo. *See*

4

*Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case. *Id.* We construe the pleadings liberally in favor of the plaintiff and look to the pleader's intent. *Id.* If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend. *Id.* at 226–27. If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Id.* at 227.

When a plea to the jurisdiction challenges jurisdictional facts, we consider the facts alleged by the plaintiff and, "to the extent it is relevant to the jurisdictional issue, the evidence submitted by the parties" to determine whether the plaintiff has affirmatively demonstrated the court's jurisdiction to hear the case. *See Texas Nat. Res. Conservation Comm'n v. White*, 46 S.W.3d 864, 868 (Tex. 2001). The process of deciding whether jurisdictional facts have been affirmatively pleaded is similar to a summary judgment: if the evidence does not raise a genuine issue of fact regarding the jurisdictional issue, then the plea to the jurisdiction should be granted. *See Miranda*, 133 S.W.3d at 228.

The City is a governmental entity and therefore has immunity from suit unless the legislature waives that immunity. *See City of Houston v. Williams*, 353 S.W.3d 128, 134 n.5 (Tex. 2011). One such waiver is found under the employment discrimination provisions of Labor Code chapter 21, which state that an employer commits an unlawful employment practice if, because of an employee's gender, the employer "fails or refuses to hire an individual, discharges an individual, or

5

discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment."[2] Tex. Lab. Code Ann. § 21.051(1); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 660 (Tex. 2008) (holding that Labor Code chapter 21 clearly and unambiguously waives immunity from suit) ("*Garcia I*").

Labor Code chapter 21's waiver of immunity only applies in those suits in which the plaintiff alleges a violation within the scope of the statute. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012) ("*Garcia II*"). If the plaintiff does not sufficiently plead facts that state a claim under Labor Code chapter 21, the governmental unit may challenge the pleadings with a plea to the jurisdiction. *Id.* at 635. Using the same procedural device, the governmental unit may also challenge the very existence of those jurisdictional facts. *Id.*

"In a suit against a governmental employer, the prima facie case implicates both the merits of the claim *and* the court's jurisdiction because of the doctrine of sovereign immunity." *Garcia II*, 372 S.W.3d at 635–36. If the suit involves claims of disparate treatment, the prima facie case requires proof that the discrimination claimant was treated less favorably than a similarly situated comparator from the opposing class. *See University of Tex. Med. Branch at Galveston v. Petteway,* 373 S.W.3d 785, 789 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

There are two alternative methods by which a plaintiff can establish discrimination or retaliation under Labor Code chapter 21. *See Garcia II*, 372 S.W.3d at 634. First, a plaintiff can offer direct evidence of the employer's

---

[2] The Texas Legislature patterned Labor Code chapter 21 after federal law for the express purpose of carrying out the policies of Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, 253 and its subsequent amendments. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 474 (Tex. 2001); *see* 42 U.S.C. §§ 2000e–2000e-17. When analyzing a claim brought under Labor Code chapter 21, we therefore look to state cases as well as to the analogous federal statutes and the cases interpreting those statutes. *Id.* at 476.

discriminatory actions or words. *Id.* "Direct evidence of discrimination is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *College of the Mainland v. Glover*, 436 S.W.3d 384, 392 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (quoting *Jespersen v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 653 (Tex. App.—Dallas 2012, no pet.)). "Courts have tended to find that insults or slurs against a protected group constitute direct evidence of discrimination." *Anderson v. Houston Cmty. Coll. Sys.*, 458 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2015, no pet.). For workplace comments to provide sufficient evidence of direct discrimination, the comments must be: (1) related to the employee's protected class; (2) proximate in time to an adverse employment decision; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue. *Id.* at 644. "If an inference is required for the evidence to be probative as to the employer's discriminatory animus, the evidence is circumstantial, not direct." *Id.* at 643. As our supreme court has observed, direct evidence of discrimination is a rarity in employment cases. *See Garcia II*, 372 S.W.3d at 634.

In the alternative to presenting direct evidence, a plaintiff can proceed with indirect or circumstantial evidence of discrimination or retaliation. *See Russo v. Smith Int'l, Inc.*, 93 S.W.3d 428, 434 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). Under this second method, the employee must make a prima facie case of discrimination under the *McDonnell–Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05 (1973).

To establish a prima facie case of discrimination with indirect evidence, the plaintiff must show that: (1) she was a member of a protected class, (2) she was qualified for the position she applied for; (3) she suffered an adverse employment action, such as termination or rejection; and (4) nonprotected class employees were

not treated similarly. See *generally id.* at 802. Once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant-employer to articulate legitimate nondiscriminatory reasons for any allegedly unequal treatment. *Id.* After the employer articulates a nondiscriminatory reason, the burden shifts back to the employee to prove that the articulated reason is a mere pretext for unlawful discrimination. *Id.* at 804. Although the burden of production shifts between the parties, the burden of persuasion "remains continuously with the plaintiff." *Greathouse v. Alvin Indep. Sch. Dist.*, 17 S.W.3d 419, 423 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (citing *McDonnell,* 411 U.S. at 803).

"To establish a prima facie case of retaliation, a person must show: (1) she engaged in an activity protected by [Labor Code chapter 21], (2) she experienced a material adverse employment action, and (3) a causal link exists between the protected activity and the adverse action." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 782 (Tex. 2018). The causal link must be established through but-for causation. *See Apache Corp. v. Davis*, 627 S.W.3d 324, 335 (Tex. 2021). Thus, claims of retaliation and discrimination both require the plaintiff to demonstrate that they experienced an adverse employment action. *See Green,* 411 U.S. at 802; *Clark*, 544 S.W.3d at 782.

Constructive discharge is an alternative method available to plaintiffs in employment cases to satisfy the adverse-employment-action element of their case. *City of Houston v. Carter*, No. 01-22-00453-CV, 2023 WL 3632788, at *8 (Tex. App.—Houston [1st Dist.] May 25, 2023, no pet.). In essence, constructive discharge converts the plaintiff's voluntary act of resigning into an adverse employment action. *See Green v. Brennan*, 578 U.S. 547, 555 (2016). This Court has articulated the standard for constructive discharge as follows:

whether a reasonable employee would feel compelled to resign

8

depends on the facts of each case, but several factors have been identified as bearing on this inquiry. These include the following: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and (6) offers of early retirement that would make the employee worse off whether the offers were accepted or not.

*Microsoft Corp. v. Mercieca*, 502 S.W.3d 291, 312 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

## B.     The trial court lacked jurisdiction

In the City's first issue, it argues the trial court erred in striking two of its exhibits. We do not address the City's evidentiary issue because without considering the excluded evidence, we conclude that Wills has not affirmatively demonstrated a waiver of immunity from suit for her discrimination and retaliations claims. Tex. R. App. P. 47.1.

### 1.     Prima facie evidence of discrimination and retaliation

Under the first prong of the burden-shifting analysis, to establish a prima facie case for both retaliation and discrimination, Wills needed to prove that she suffered an adverse employment action. *See McDonnell,* 411 U.S. at 802; *Clark*, 544 S.W.3d at 782. Wills identifies four alleged adverse actions she suffered: (1) she was stripped of her role acquiring, retiring, and assigning horses; (2) she was removed as barn sergeant/training sergeant; (3) she was involuntarily transferred out of mounted patrol entirely; and (4) she resigned from the police department, which she alleges constituted a constructive discharge. But Wills has not provided sufficient evidence to create a genuine fact issue as to whether any of these events constituted an adverse employment action.

### a.     Adverse employment action

"To adequately plead an adverse employment action, plaintiffs need not allege discrimination with respect to an 'ultimate employment decision.' Instead, a plaintiff need only show that she was discriminated against, because of a protected characteristic, with respect to hiring, firing, compensation, or the 'terms, conditions, or privileges of employment.'"[3] *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 506 (5th Cir. 2023). Thus, based on the specific facts of each case, a wide range of employment actions may constitute an "adverse employment action." *See, e.g.*, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (observing that "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" may all constitute an adverse employment action); *Hamilton*, 79 F.4th at 503–05 (concluding that changing employee's shift to less favorable one is action that affects "terms, conditions, or privileges of employment"); *Serna v. City of San Antonio*, 244 F.3d 479, 483 (5th Cir. 2001) ("A transfer, even without an accompanying cut in pay or other tangible benefits, may constitute an adverse employment action[.]"); *Forsyth v. City of Dallas, Tex.*, 91 F.3d 769, 774 (5th Cir. 1996) (demotion may constitute adverse employment action).

However, a plaintiff must provide more evidence than their mere subjective belief that they have experienced an adverse employment action. *See Serna*, 244

---

[3] "[T]he Texas Commission on Human Rights Act (TCHRA) . . . 'is a comprehensive fair employment practices act and remedial scheme, modeled after Title VII of the federal Civil Rights Act of 1964 (Title VII), that provides the framework for employment discrimination claims in Texas.'" *Jespersen*, 390 S.W.3d at 653 (quoting *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 502–03 (Tex. 2012)); *see* Tex. Lab. Code Ann. §§ 21.001–.556. "In discrimination and retaliation cases under the TCHRA, Texas jurisprudence parallels federal cases construing and applying equivalent federal statutes, like Title VII." *Clark*, 544 S.W.3d at 781.

F.3d at 483 (noting in context of deciding whether job transfer was adverse employment action, "it is insufficient for a plaintiff to show merely that he has been transferred from a job he likes to one that he considers less desirable. Rather, a plaintiff must produce enough evidence to allow a reasonable trier of fact to conclude that, when viewed objectively, the transfer caused harm to the plaintiff, 'sufficiently serious to constitute a constitutional injury'") (quoting *Breaux v. City of Garland,* 205 F.3d 150, 152 (5th Cir. 2000); *Forsyth*, 91 F.3d at 774 ("a plaintiff's subjective perception that a demotion has occurred is not enough" to demonstrate an adverse employment action).

The present case is like *Serna*, in which the Fifth Circuit ultimately concluded that the evidence produced by the plaintiff amounted to nothing more than a subjective belief that "he felt stigmatized and injured," which was insufficient to prove that he had suffered an adverse employment action. *See Serna*, 244 F.3d at 484. In *Serna*, the plaintiff, Serna, complained about his transfer from the HPD downtown foot and bike patrol unit to a regular patrol unit. *See id.* Even though several officers testified that the downtown foot and bike patrol unit was a "prestigious assignment" and that officers in that unit were given more freedom to stop criminal activity, "[t]here was no evidence to suggest that a transfer to a regular patrol unit was generally considered to be a demotion or any kind of punishment." *Id.* at 483–84. Based on the record, the court noted that being in the downtown foot and bike patrol unit seemed to simply be a matter of "personal preference." *Id.* at 485. Although Serna's shift hours changed after the transfer, "nothing in the record shows that Serna was bothered by his new hours or that he attempted to get them changed, as he had with his days off." *Id.* Serna also never received a reduction in pay or benefits, "and he produced no objective evidence that his chances for promotion were reduced by his transfer." *Id.* Thus,

11

the court concluded that "[a]ll the evidence established was that Serna was transferred from a unit considered prestigious and desirable to another unit on the force, one to which most of his fellow officers were assigned. That is insufficient to establish that Serna suffered an adverse employment action." *Id.*

Wills argues "it is beyond any dispute that taking an expert horsewoman who is running one of the largest and most prestigious Mounted Patrol barns in the country, and reassigning her to be an ordinary beat cop, or to working the security desk downtown, is an objectively worse job." But Wills's evidence did nothing more than assert that being in the mounted patrol was a "personal preference." *Id.* She offered no additional affidavits from third parties or other evidence suggesting that being in the mounted patrol was considered prestigious or a promotion. Like in *Serna*, Wills also offered no evidence that being transferred to the downtown patrol was generally considered to be a demotion or a form of punishment. Wills does not appear to ever complain about any change in her shift hours, and she does not allege that she received a reduction in pay or benefits.

Wills additionally claims that while she "could have sought out certain other assignments within the department, she had been permanently barred from Mounted Patrol, the department she had dedicated her professional life to, and had the black mark of an involuntary transfer and a bad performance review." But once again, this assertion is unaccompanied by any evidence suggesting that an involuntary transfer or a bad performance review would serve as "black mark" preventing her obtaining other positions or ranks. She does not plead any facts suggesting that she was denied a promotion or job transfer because of the "black mark" she received.

Concerning her allegation of constructive discharge, Wills has not demonstrated "intolerable circumstances" that essentially forced her to retire. After

Wills made her original complaints against Thomas, HPD immediately shielded Wills from Thomas, by removing him from mounted patrol and reassigning him to temporary duty at an airport. It is undisputed that Thomas never returned to mounted patrol, and never again supervised or even had face-to-face contact with Wills. When Wills was involuntarily transferred from mounted patrol more than three months later, she was afforded the opportunity to arrange a transfer to any division holding an existing vacancy. And then she requested a voluntary transfer to downtown security several weeks later. Throughout that time, Wills does not allege that she received a reduction in pay, or that she was badgered, or humiliated, or that she was reassigned to menial or degrading work. Beyond her subjective beliefs, Wills has not presented evidence to suggest that a reasonable employee would feel compelled to resign. *Mercieca*, 502 S.W.3d at 312.

On all four of her claims of adverse employment action, including her claim of constructive discharge, Wills ultimately offers only her subjective belief, which is insufficient. *See Serna*, 244 F.3d at 483. The subjective evidence presented by Wills stands in contrast to other cases in which the plaintiffs provided at least some "objective" evidence that an adverse employment action had occurred. *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (finding plaintiff provided sufficient evidence to create fact issue as to whether reassignment was adverse employment action because there was "considerable evidence that the track laborer duties were 'by all accounts more arduous and dirtier'; that the 'forklift operator position required more qualifications, which is an indication of prestige'; and that 'the forklift operator position was objectively considered a better job and the male employees resented White for occupying it'"); *Kessler v. Westchester Cnty. Dep't of Soc. Services*, 461 F.3d 199, 208–09 (2d Cir. 2006) (concluding evidence was sufficient to satisfy step-one burden in which

plaintiff provided affidavit and official job descriptions to demonstrate that transfer stripped him of many responsibilities and that "he was no longer given any managerial assignments and was not even allowed to attend meetings of lower-level managers"); *Forsyth*, 91 F.3d at 774–75 (plaintiff provided evidence that tended to show that positions in intelligence unit were more prestigious, had better working hours, were more interesting than those in night uniformed patrol, and that other members of department had been transferred to night uniformed patrol as punishment); *Click v. Copeland*, 970 F.2d 106, 110 (5th Cir. 1992) (plaintiff provided evidence sufficient to create fact issue as to whether adverse employment action occurred: (1) the assistant director of the jail unit stated that "everybody" considered transfer from jail to law enforcement to be a promotion; (2) the civil service director said that eight people appealed transfers from law enforcement to jail, but only one appealed a transfer the other way; (3) Sheriff stated that all jail guards would like to be transferred to law enforcement section if they could; and (4) two deputies lost certain seniority rights after their transfer).

### b. Nonprotected class employees were treated similarly

We also note that Wills has not demonstrated that she was treated differently than male counterparts in a nearly identical situation; the record suggests the opposite. Wills complains that Thomas acted unprofessionally and yelled at her and belittled her in front of other male colleagues, but he apparently did the same with her male sergeant colleagues. She complains that she had essentially perfect performance reviews until Thomas became lieutenant and then he started reducing her performance evaluation, which is true. But Thomas started reducing the performance reviews of at least two other male sergeants at the same time as Wills. And two other male officers were also transferred away from mounted patrol at the same time as Wills.

14

Wills has not provided prima facie evidence that she suffered an adverse employment action for both her discrimination and her retaliation claims. However, even if any of the complained-of actions constituted an adverse employment action, she has not overcome the City's nondiscriminatory reasons for any allegedly unequal treatment she received.

### 2. The City provided nondiscriminatory reasons for its actions and Wills did not prove that the City's stated reasons were merely pretext for discrimination

As outlined above, and as established by the pleadings and the relevant nonstricken evidence, the tension created by Wills and Thomas negatively affected the unit's ability to function.

Garcia informed Wills that she needed to respect the chain of command and indicated that if she could not do so, then "changes" would be made. When Garcia met with officers in the mounted patrol, they stated that even after being previously advised, Wills continued to act "like the de facto commander, which was negatively impacting the unit as the officers did not know whose orders to follow." Thomas noted that Wills continued to directly disobey his directives. Her "Report of Employee Efficiency Rating" suggested that disobeying superiors was "a pattern of behavior with Sergeant Wills, who also struggled to comply with changes implemented by the previous lieutenant." Even when Wills remained in mounted patrol and Thomas was removed, the new lieutenant, Dobrucki, noted that Wills continued to create tension. In response, Wills did not show that the City's nondiscriminatory reasons for its actions were simply pretext.[4]

---

[4] We offer no opinion as to whether Wills was treated fairly by the City and her supervisors, but simply having a bad boss is not enough to prevail on her claims. Even if Wills's allegations were true, the evidence is still insufficient to demonstrate that Wills suffered statutory discrimination or retaliation.

We sustain the City's second and third issues. And as addressed above, because of our disposition on issues two and three, it is unnecessary for us to address the City's first issue. *See* Tex. R. App. P. 47.1.

## C.     Opportunity to amend petition

Because the jurisdictional evidence establishes that Wills's claims are barred by governmental immunity from suit, the trial court should have granted the City's plea to the jurisdiction. Having reached this conclusion, we must next decide whether Wills is entitled to an opportunity to amend her petition. *See Dohlen v. City of San Antonio*, 643 S.W.3d 387, 397 (Tex. 2022) (Texas courts allow parties to replead unless their pleadings demonstrate incurable defects).

Wills cannot overcome the City's legitimate, nondiscriminatory reasons for its actions, as outlined above. Also, Wills has not suggested there is a jurisdictional defect she can cure. *See Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 840 (Tex. 2007) (dismissing claim and concluding plaintiff was not entitled to amend petition, noting that plaintiff's "pleading defects cannot be cured, and he has made no suggestion as to how to cure the jurisdictional defect"). Based on the extensive facts already in the record or pleadings, remanding this case to allow Wills to amend her petition would serve no legitimate purpose because she cannot overcome the defects of her pleadings. Accordingly, Wills is not entitled to an opportunity to amend in this case.

### III. CONCLUSION

We reverse the trial court's order denying the City's plea to the jurisdiction and render the judgment the trial court should have rendered: a judgment dismissing Wills's suit against the City for want of subject-matter jurisdiction. Tex. R. App. P. 43.2(c).

/s/    Charles A. Spain
        Justice

Panel consists of Justices Bourliot, Zimmerer, and Spain.