17-3371-cv
*Davis-Garett v. Urban Outfitters, Inc.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2018

(Argued: October 23, 2018                 Decided:  April 8, 2019)

Docket No. 17-3371-cv

_____

BLAIR DAVIS-GARETT,

*Plaintiff-Appellant*,

- v. -

URBAN OUTFITTERS, INCORPORATED, ANTHROPOLOGIE,
INCORPORATED,

*Defendants-Appellees*.

_____

Before:  KATZMANN, *Chief Judge*, KEARSE and CHIN, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the

Southern District of New York, Thomas P. Griesa, *Judge*, dismissing plaintiff's claims

of retaliation and hostile-work-environment discrimination, in violation of the Age

Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634, and state laws. The district court granted summary judgment in favor of defendants, ruling that plaintiff failed to adduce evidence (a) of age-related abuse sufficient to support her claims of discrimination, and (b) of an adverse employment action sufficient to support her claims of retaliation. On appeal, plaintiff contends that the district court erred in failing to view the evidence in the light most favorable to her and in applying erroneous legal standards. As to plaintiff's federal claims, we conclude that the district court erred in refusing to consider evidence of events that, though they preceded the actionable time period if viewed as discrete events, remain actionable as part of a hostile work environment and relevant as background for a claim of retaliation; that in assessing the claims of retaliation, the court erroneously applied the standard applicable to claims of discrimination rather than claims of retaliation; and that the evidence, viewed in the light most favorable to plaintiff, sufficed to present triable issues of material fact as to the claims of hostile work environment and retaliation. Accordingly, we vacate the judgment and remand for trial of those claims, and for further consideration of plaintiff's state-law claims.

Vacated and remanded.

2

BRIAN HELLER, New York, New York (Davida S.Perry, Schwartz Perry & Heller, on the brief), *for Plaintiff-Appellant*.

BLAIR J. ROBINSON, New York, New York (Morgan, Lewis & Bockius, New York, New York, on the brief), *for Defendants-Appellees*.

GAIL S. COLEMAN, Washington, D.C. (James L. Lee, Deputy General Counsel, Jennifer S. Goldstein, Associate General Counsel, Elizabeth E. Theran, Assistant General Counsel, Susan L. Star, Attorney, United States Equal Employment Opportunity Commission, Washington, D.C., on the brief), *for Amicus Curiae Equal Employment Opportunity Commission in support of Plaintiff-Appellant*.

Outten & Golden, New York, New York (Darnley D. Stewart, of counsel), *filed a brief for Amicus Curiae National Employment Lawyers Association/New York in support of Plaintiff-Appellant*.

KEARSE, *Circuit Judge*:

Plaintiff Blair Davis-Garett ("Garett") appeals from a judgment of the United States District Court for the Southern District of New York, Thomas P. Griesa, *Judge*, dismissing her complaint alleging principally that her former employer, defendants Anthropologie, Inc. ("Anthropologie"), and its corporate parent Urban

Outfitters, Inc., discriminated against her on the basis of age by maintaining a hostile work environment and retaliated against her for lodging discrimination complaints, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634 ("ADEA"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-51 *et seq.* ("CFEPA").  The district court granted summary judgment in favor of defendants, ruling principally that Garett failed to adduce sufficient evidence of age-related abuse to create triable issues of fact with respect to her ADEA claims of hostile work environment, and failed to adduce sufficient evidence of an adverse employment action to support to her ADEA claims of retaliation.  On appeal, Garett contends that in dismissing her claims the district court erred by failing to view the evidence in the light most favorable to her, by refusing to take into account certain evidence that predated the actionable period, and by applying an erroneous legal standard to the claims of retaliation.  For the reasons that follow, we agree; we vacate the judgment and remand for further proceedings, including trial of the federal claims, and additional consideration of the state-law claims.

# I. BACKGROUND

From September 2012 until early October 2013 Garett was employed by Anthropologie, a nationwide retailer that sells women's apparel and accessories, home furnishings, decor, gifts, and "found objects." During that period, she worked at three Anthropologie stores: first at the Roosevelt Field Mall on Long Island in New York ("Roosevelt Field"), next in White Plains, New York, at the Westchester Mall ("White Plains"), and finally in Greenwich, Connecticut. The record developed during discovery, which includes Garett's deposition testimony, her affidavit, and deposition testimony and/or declarations from several managers at Anthropologie, reveals many factual disputes, chiefly as to who said what to whom, and when. The following description of conversations and events, except where indicated, takes the record in the light most favorable to Garett, based principally on admissible factual assertions in her deposition and her affidavit.

A.  *The Roosevelt Field Store*

When Garett began working at Anthropologie's Roosevelt Field store in September 2012—as a part-time customer associate—she was 54 years of age, significantly older than most of the other sales associates, who were in their 20's. That store's overall manager, Jennifer Orr, was approximately 28 years of age, and most of the other managers were in their 20's or early 30's. Customer associates were responsible for assisting customers with purchasing, both on the sales floor and in the fitting room; but Anthropologie's policies and procedures called for such sales persons to be rotated hourly through the various sections of the store in order to gain a range of experience. Younger sales associates were given that training. Garett, however, despite her repeated requests to Orr for assignments that would provide her with experience in other aspects of store operations and allow her to advance in the company, was assigned to spend most of her working hours in the fitting room. (*See* Deposition of Blair Davis-Garett ("Garett Dep.") at 35–40, 54–55; Affidavit of Blair Davis-Garett dated March 22, 2017 ("Garett Aff."), ¶¶ 6–7.)

In early 2013, for business reasons, Anthropologie's Roosevelt Field store was permanently closed. Some employees, including Garett, were transferred to

other Anthropologie locations. Younger transferred employees who lived on Long Island were reassigned to Anthropologie stores on Long Island. Garett, who also lived on Long Island, was reassigned to the Anthropologie store in White Plains, more than 30 miles away. When she sought reassignment to one of the closer locations, she was told that decisions to put others at those locations had already been made, and that White Plains was her "only option." (Garett Aff. ¶ 9.) Garett says she was later told that she was sent to the White Plains store "because of the 'demographics in White Plains,'" *i.e.*, "that the people that shopped in the store were older and that I was old and that is why I was transferred there." (*E.g.*, *id*. ¶ 23 (attributing the quoted statements to White Plains store manager Kelly Bentley).)

B. *The White Plains Store*

Garett became a sales associate at Anthropologie's White Plains store in late January 2013—still part-time—reporting to store manager Kelly Bentley, who was approximately 35 years of age. Garett was again assigned to the fitting room for the majority of her shifts and received no training. In addition, Garett was assigned the least desirable duties. When customers left behind unsanitary trash or waste, Garett

7

was instructed to clean it up—an assignment she attributed to her age. (*See, e.g.*, Garett Aff. ¶¶ 15–17.) Garett testified that she was "ostracized" by her coworkers (Garett Dep. 84), and that they repeatedly called her "'Mom'" or "'Mommy,'" despite her telling them that this was not appropriate in a workplace (Garett Aff. ¶ 14; *see* Garett Dep. 86–91). They also asked her to take care of their cuts, bruises, and other ills; and they consulted her about their personal problems. (*See* Garett Aff. ¶ 14.)

In March 2013, Garett became a full-time customer associate at the White Plains store. Her responsibilities and duties remained unchanged; she was assigned principally to the fitting room and was given no training. (*See id*. ¶ 18.) In about June 2013, Garett learned of an opening in the position of apparel supervisor, and she told Bentley she was interested in applying. (*See id*. ¶ 21.) Garett testified that in response,

> Kelly took me out of the store. We went to . . . the remote storeroom. . . . And *she told me* that it was completely impossible, that I didn't have the energy or the stamina, *that I was too old for the job*.

> *She said, look around you. Everybody in the company is young*. She said, look at the district manager; she's really young. She laughed. . . . She said . . . you would never be able to do it, you don't have the energy. . . . *You're too old. She said, the only reason you were sent here is because of the demographics here*, that it's—*the*

*people that shop here are older and you're old, and that's why they sent you here.* And you would never be able to handle being a manager.

She said, how are you going to be able to handle all the closing and the openings? You'll never be able to do it.

(Garett Dep. 112–13 (emphases added); *see, e.g.*, Garett Aff. ¶ 22 ("Bentley . . . . said that I was 'too old for the job'" and "'You will never be able to do it. You don't have the energy.'" (emphases omitted)).)

Garett, hurt by Bentley's comments, called Anthropologie's anonymous employee hotline and left a voicemail message stating that her manager had made disparaging comments about her age. (*See* Garett Aff. ¶¶ 24–25.) Garett testified that she then received a call from district manager Amy Shearer, who was responsible for handling hotline complaints; that Shearer said Bentley's statements were "'terrible'"; and that Shearer said she would speak to Bentley. (*Id.* ¶ 26; *see* Garett Dep. 123–24.) Shortly thereafter, Garett was promoted to the apparel supervisor position.

In her new position as apparel supervisor, Garett reported to Bentley and to Kara Fitzpatrick, the store's apparel manager. Bentley was hostile to Garett, intimidating and unfair in her criticisms. (*See, e.g.,* Garett Aff. ¶¶ 33, 42.) Garett made no progress. Despite her promotion, she remained consigned to the fitting room for

nearly all of her shifts (*see* Garett Dep. 80); and she was assigned "the least desirable tasks and hours" (Garett Aff. ¶ 33). In her first 20 shifts as apparel supervisor, Garett was required to open the store on 10 consecutive days and then to close the store on 10 consecutive nights, "a very difficult and exhausting task." (*Id*.) Garett later learned that no other supervisor had ever been asked to work such a demanding schedule. (*See id*.)

Garett was increasingly isolated in her new position. Management group meetings were scheduled in her absence. While younger employees received training opportunities on payroll and other managerial functions, Garett was required to learn the job on her own. And Fitzpatrick criticized her "'speed'" and "'pace'" "almost daily." (*Id*. ¶¶ 35–36.) About 10 days after her promotion, Garett was called into Bentley's office and berated by both Bentley and Fitzpatrick:

> [They] told me that I was doing a terrible job, that I was the worst apparel supervisor that they had ever seen in their lives, that I was not cut out to do the job . . . that my energy level, my pace was too slow . . . .

(Garett Dep. 144–45.)

On July 8, Garett called the employee hotline to complain about her treatment by her supervisors. Bentley subsequently received a disciplinary warning

10

that cited three instances of her unsatisfactory performance. Two related to store security infractions observed on June 3 and July 16. The other, without mentioning Garett's name, described her July 8 complaints about Bentley's lack of support and constructive feedback in the training of "a newly promoted supervisor"; and it added that "the supervisor mentioned that Kelly has made comments about her age and has questioned her ability to have the energy to manage the selling floor." (Garett Aff. Exhibit F.)

1. *The Edgewater Application*

In early August, Garett learned that there was an opening in the apparel supervisor position at the Anthropologie store in Edgewater, New Jersey. As she and her husband were planning to move from Long Island to Manhattan, and the commute to Edgewater would be more convenient, Garett applied for that position and asked her district manager Shearer to approve her transfer to Edgewater. Although requests by younger coworkers for transfers were routinely processed and granted promptly, Garett heard nothing from Shearer for several weeks. Toward the end of August, Garett called the Anthropologie employee hotline to complain about

11

how her request was being handled and about Shearer in particular. (*See* Garett Aff. ¶ 45.)

In early September, Garett was interviewed for the Edgewater store apparel supervisor position by Jen Ernst, the district manager for New Jersey. According to Garett, the interview "went extremely well," and "Ernst clearly and distinctly offered me the job" and said she would contact Bentley to arrange for the transfer. (*Id*. ¶¶ 46–47.)

However, Garett was not transferred to Edgewater. Soon after Garett's Edgewater interview, Shearer received a call from Anthropologie's regional manager Jen Berry, who informed her of Garett's late-August hotline call and complaint about Shearer's handling of Garett's transfer request. (*See id*. ¶¶ 52–53.) It was in this telephone conversation that the decision not to transfer Garett to the Edgewater store was made. (*See id*. ¶ 54; Deposition of Amy Shearer ("Shearer Dep.") at 79–80.) Although Garett testified in her deposition that she did not know who made the decision to deny approval of her transfer to Edgewater (*see* Garett Dep. 163), she inferred in her affidavit that it was a "retaliat[ory]" decision made by "Shearer instantly" upon learning of Garett's complaint against her (Garett Aff. ¶ 54).

Instead of being transferred to Edgewater, Garett was transferred to the Anthropologie store in Greenwich, Connecticut, a location for which she had never applied. According to Garett,

> [s]oon after my call to [the Anthropologie] hotline, Bentley called me into her office and told me that my "transfer had come through." She then went on to advise me that I would not be going to the Edgewater store where I had been offered a job. Instead, I would be going to the Greenwich, Connecticut store, which I had never before discussed or expressed any interest in being assigned. Bentley added that I would "love" Greenwich and that "the demographics are perfect" for me.
>
> . . . I called Shearer and asked why I was being sent to Greenwich instead of Edgewater, where the District Manager had already offered me a job. Shearer became angry and said, "That's your only choice or you are fired" and, "It's Greenwich or nothing."

(*Id*. ¶¶ 55–56; *see* Garett Dep. 164–65.)

### 2. *Defendants' Version of Garett's Treatment in White Plains*

Defendants dispute, *inter alia*, Garett's account of how she was treated at the White Plains store and her view of how her promotion to apparel supervisor in White Plains came about. They also offer business explanations for the denial of her requested transfer to Edgewater and for her reassignment to Greenwich.

13

As to White Plains, Bentley denied making the June 2013 age-related statements—or any statements directed at Garett's age—that Garett described in her deposition and affidavit. (*See* Declaration of Kelly Bentley dated February 20, 2017, ¶¶ 13–14.) Bentley said she had provided Garett with constructive feedback as to how quickly she should be managing the selling floor (*see id*. ¶ 16), but said she had not given Garett onerous, distasteful, or less desirable assignments as Garett claimed, had not made the alleged statement about Garett and Greenwich demographics, and had not made any comments at any time about or relating to Garett's age (*see id*. ¶¶ 11–12, 14, 19).

Despite Garett's assertion that she promptly complained on the company hotline of explicitly age-discriminatory statements by Bentley in June 2013, Anthropologie says it has no knowledge of any hotline complaint by Garett in June. (*See* Defendants' Reply to Plaintiff's Response to Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ¶ 41.) Its earliest record of a complaint by Garett is a July 8 message from an anonymous caller (leaving a telephone number) who reported that her manager was abusing her by intimidating

her, picking on her, and demanding performance that exceeded what was demanded of everyone else.

In contrast to Garett's assertion that she had received a return call from Shearer in June in response to a hotline complaint about Bentley's age-demeaning comments, Shearer testified that the first contact she had with Garett occurred on July 9, when she called the number provided in the July 8 anonymous complaint and reached Garett. (*See* Shearer Dep. 26–31.) In that conversation, Garett identified her position as a "supervisor" at the White Plains store (*id*. at 31)—a position she had been given in June (*see, e.g.*, Garett Aff. ¶ 34). Shearer testified that she had no knowledge of how Garett came to be promoted to apparel supervisor. (*See* Shearer Dep. 76.)

Shearer testified that in the July 9 conversation, Garett complained about Bentley's criticisms that Garett's work was too slow, and that Garett interpreted those complaints as age discrimination. (*See, e.g., id*. at 58–59, 64–65.) A few days thereafter, Shearer relayed Garett's complaints to Bentley; Bentley acknowledged giving Garett feedback about "how quickly she was walking the floor" and "how quickly she was opening and closing the office" but denied making any age-based comments. (*Id*. at 46–47.) Shearer then again spoke with Garett and asked whether

she wanted to transfer to another store; Garett responded that she preferred to stay at the White Plains store and "try to work it out" so that she could move up in the company. (*Id*. at 73–75.) A couple of weeks later, Garett spoke with Shearer again and this time said she was not comfortable staying at White Plains; Garett said she was interested in transferring to the store in Edgewater. (*See id*. at 75–77.)

Edgewater was not part of Shearer's district, and she told Garett she would call New Jersey district manager Jen Ernst about Garett's interest. (Shearer made the call but had no role in the Edgewater interview process, *see id*. at 77–78.)

Some weeks later, regional manager Berry called Shearer to discuss Garett's request for that transfer and informed her that there were personnel problems at Edgewater—the details of which were not disclosed to Shearer—that made a transfer of Garett to that store unwise. (*See* Shearer Dep. 79.) Those problems, as described by Ernst during this litigation, included the fact that when Ernst interviewed Garett for the Edgewater store there was no functioning store manager. One had been appointed but was in the midst of a five-day training period; and then, two days after she finished her training and started her position, she admitted to having stolen inventory from the Anthropologie store in White Plains, at

which she was previously employed. Her employment at Edgewater was promptly terminated. (*See* Deposition of Jennifer Ernst at 18.) Ernst testified that she did not offer Garett the job of apparel supervisor, and that the final decision had to await an interview by the new store manager. (*See id*. at 44–45.)

Shearer testified that she and Berry, "knowing that [Garett] had had an uncomfortable situation" at the White Plains store, discussed finding another location for her. (Shearer Dep. 79.) Shortly thereafter, Shearer spoke with Garett and informed her that she would not be transferred to Edgewater because that transfer would not be in Garett's best interests. However, because there was an Anthropologie store in Greenwich, which was not far from White Plains, Shearer suggested that Garett transfer to the Greenwich store, which was managed by the former Roosevelt Field manager Orr, with whom Garett had had a good relationship. (*See id*. at 85; *see generally* January 15, 2013 email from Garett to Orr ("Jen, Once again I really want to say thank you for all you have done for me, and all that I have learned from you. I truly have the deepest respect for you, not only as a manager, but also, as an individual. Most importantly, you taught me how to handle every situation

17

with grace. A quality you embody. We are all moving on, but I hope we will have the opportunity to work together again. It was amazing! Blair").)

Shearer testified that Garett was initially "confused" about the prospect of going to Greenwich because she preferred the Edgewater location and felt that her interview with Ernst had gone well. (Shearer Dep. 84–86.) Shearer denied ever telling Garett that a transfer to Greenwich was her only option or she would be fired. (*See id*. at 89.)

C. *The Greenwich Store*

Garett began working at the Greenwich store, managed by Orr, in September 2013. Although Garett retained the title of apparel supervisor, the Greenwich store already had an apparel supervisor, and Garett was given none of the position's supervisory responsibilities "other than closing and opening the store[], which no one wants to do." (Garett Aff. ¶ 65.) Garett was "basically ignored" by Orr, was denied training opportunities, and was "again relegated to the fitting room." (*Id*. ¶ 63.)

Garett's tenure at Greenwich lasted only a few weeks. On Thursday October 3, Garett was responsible for closing the store. At about 7:30 that evening, she and two other employees were the only ones in the store when a "kind of scruffy man" came in and asked to see lamps; he was very agitated and was acting strangely. (Garett Dep. 172–74.) He left the store and reentered several times, and he angrily "shushed" a sales associate while on his cell phone. (*Id*. at 178–82.) Garett knew that the store "had had a lot of shoplifters the previous two weeks" (*id*. at 178–79), and she observed the man walk around the store "[a]s if he was—he was kind of casing the place"; she "was concerned that he may eventually either shop lift or eventually wait for the doors to close and remain in the store and—and steal" (*id*. at 180). Garett testified that "[t]he girls were extremely frightened" and she decided to call the nonemergency number for the Greenwich police. (*Id*. at 182.) Two police officers arrived shortly thereafter and escorted the man out of the store.

On Friday morning, Garett was approached by the store's "visual manager" Leanne Meyer, who "was extremely hostile and wanted to know exactly what happened the night before." (*Id*. at 189; *see* Garett Aff. ¶ 67.) Meyer said she

knew the man, who had been trying to buy a lamp for his wife, and she was quite upset at the way he had been treated. (*See* Garett Dep. 189–90.)

On Monday October 7, Orr, who had been away for the weekend, summoned Garett to her office to discuss the October 3 incident. With Meyer present, Orr reprimanded Garett for failing to adhere to Anthropologie's corporate policy, which was to refrain from automatically calling the police on suspected shoplifters. Garett testified that Orr fired her by saying "this is your final warning. . . . [Y]ou've done a terrible thing. You never should have done what you did. This is your final warning. It's over. . . . [Y]ou're done. It's over." (*Id.* at 204–05.)

> Orr told me that I was being given a third and final warning and then said, "That's it. You're done. It's over with. That's it. You're done. It's finished." . . . . I told Orr that I had never been given a first or second warning and asked what does this third and final warning mean. Orr responded, "It means you're done. That is it." . . . . It was clear I was being terminated. . . . [S]o I turned in my keys to the employee who checked me out and left the workplace.

(Garett Aff. ¶ 69.)

Defendants contend that Garett had not been fired. Orr (in addition to denying that she had ever treated Garett any differently than younger employees (*see* Declaration of Jennifer Orr dated February 20, 2017 ("Orr Decl."), ¶¶ 11–12, 19)) stated

that she "did not terminate []Garett's employment" (*id*. ¶ 27; *see* Deposition of Jennifer

Orr ("Orr Dep.") at 160). Orr denied having said, *inter alia*, "'this is your third and

final warning,'" or "'[i]t's over,'" or "'you're done,'" or anything else implying that

Garett's employment was being terminated. (Orr Decl. ¶¶ 28–30.) Nor did Orr ask

Garett for her store keys or remove her from the work schedule. (*See id*. ¶ 31.)

Meyer stated that she had attended that October 7 meeting at the request

of Orr, in order to witness Orr giving Garett a written warning for violating

Anthropologie policy on October 3 by hastily calling the police and thereby publicly

humiliating a customer. (*See* Declaration of Leanne Meyer dated April 3, 2015

("Meyer Decl."), ¶¶ 6–8.) Orr herself, however, testified that when she began the

meeting with Garett she was trying to get Garett's version of the event and had not

decided to give Garett a written warning; she made the decision to do so during the

meeting. (*See* Orr Dep. 91, 121–24.) Orr's recollection was that at that meeting she

issued a written warning to Garett for violating Anthropologie's policy, and that "[w]e

chatted about the next step, if anything like that ever happens again, the next step of

contacting me and being able to talk through it together and work together through

it in the future." (*Id*. at 121.) Meyer stated that Garett "refused to sign the written

warning form but did agree to work with [Orr] to problem solve future situations together."  (Meyer Decl. ¶ 9.)

Garett maintains that she "was not given the document that Anthropologie relies upon."  (Garett Aff. ¶ 74; *see* Garett Dep. 196 ("Nobody showed me anything that day.").)  After the meeting, Garett left the store and did not return. (*See* Garett Aff. ¶¶ 69, 74.)  Attempts by Orr and Meyer to reach her went unanswered.  (*See, e.g.*, Orr Decl. ¶¶ 32–34; Meyer Decl. ¶ 10.)


D. *The District Court's Grant of Summary Judgment*

After pursuing administrative remedies with state authorities in Connecticut, Garett commenced the present action in the district court in December 2015.  Her complaint, to the extent pertinent to the claims pursued on this appeal, alleged or summarized the above events and asserted age-based hostile work environment claims and retaliation claims under the ADEA, NYSHRL, and CFEPA. Following the completion of discovery, defendants moved for summary judgment, contending principally that the incidents Garett alleged did not create conditions so severe or pervasive as to permit an inference of a hostile work environment, and that

22

the claims of retaliation failed because she could not establish that she suffered any adverse employment action.

The district court, in an opinion dated September 27, 2017, *Davis-Garett v. Urban Outfitters, Inc.*, No. 15-CV-09598, 2017 WL 4326112 (S.D.N.Y. 2017) ("D. Ct. Op."), granted the motion, concluding that Garett failed to adduce sufficient evidence to show a prima facie case of discrimination or retaliation.

Preliminarily, the court stated that ADEA claims as to earlier aspects of Garett's employment by Anthropologie were untimely. It ruled that her evidence "pertaining to incidents occurring before February 16, 2013—300 days prior to" her commencement of administrative proceedings, "[we]re time barred" and would "not be considered." *Id.* at *3. "This includes the time that Garett worked at the Roosevelt Field Mall Store and the first month of her time at the White Plains Store." *Id.*

With respect to the ADEA hostile work environment claim, the court also ruled (as described in Part II.C. below) that the evidence adduced by Garett—as to the comments made to her by Bentley and Fitzpatrick that she was too slow, as to the assignments to the fitting room, and as to the prolonged assignments to open and close the store—was insufficient to establish a hostile work environment claim.

In dismissing Garett's ADEA retaliation claim, the court applied the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), focusing in particular on the requirement that the plaintiff show that she suffered an adverse employment action. Quoting language from *Galabya v. New York City Board of Education*, 202 F.3d 636, 640 (2d Cir. 2000) ("*Galabya*"), the district court stated that, in order "[t]o successfully show an adverse employment action, the plaintiff must show that he or she experienced a 'materially adverse *change*' *in the terms and conditions of employment*," such as "demotions, decreases in salary, and decreases in responsibility." D. Ct. Op., 2017 WL 4326112, at \*4 (emphasis ours). As described more fully in Part II.C. below, the court concluded that the incidents recounted by Garett "fail[ed] to provide sufficient evidence" of an "adverse employment action," *id*. at \*5.

Finding the same analyses applicable to Garett's claims under the NYSHRL and CFEPA, the court dismissed her state-law claims as well. *See id*.

## II. DISCUSSION

On appeal, Garett contends principally that in dismissing her hostile work environment claims, the court erred in refusing to consider evidence of events that predated the limitations period and in failing to view the evidence in the light most favorable to her as the party against whom summary judgment was sought; and that in dismissing her retaliation claims, the court erred in adopting an "oversimplifi[ed]" view of the record as devoid of proof that Garett suffered an adverse employment action, by failing to look at "the specific circumstances" of Garett's treatment (Garett brief on appeal at 40). The United States Equal Employment Opportunity Commission ("EEOC"), as *amicus curiae*, urges us to reverse the dismissal of Garett's ADEA hostile work environment claim on the ground that the district court erred in ruling that it could not consider evidence of events that occurred prior to February 16, 2013, and to reverse the dismissal of Garett's ADEA retaliation claim on the ground that the district court erroneously applied a standard applicable to substantive discrimination claims rather than the standard announced

25

by the Supreme Court in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("*White*"), for claims of retaliation.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The procedural constraints are discussed in Part II.C. below; we begin here with the substantive law.

A. *Principles Governing ADEA Hostile Work Environment Claims*

With respect to an individual over the age of 40, the ADEA makes it unlawful for an employer to "discriminate against [the] individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §§ 623(a)(1), 631(a). This language is virtually identical to that of Title VII, which prohibits employment discrimination because of race, color, religion, sex, or national origin, *see* 42 U.S.C. § 2000e-2(a)(1). Such prohibitions encompass "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) ("*Harris*"). They are violated

26

> [w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

*Id.* (Title VII) (internal quotation marks omitted); *see, e.g.*, *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 240 (2d Cir. 2007) (ADEA). "Isolated, minor acts or occasional episodes do not warrant relief," *Brennan v. Metropolitan Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999) ("*Brennan*") (Title VII and ADEA), but that "does not mean that employers are free from liability in all but the most egregious cases," *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (Title VII and ADEA) (internal quotation marks omitted).

Actionable hostile work environment claims have both objective and subjective components.

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris*, 510 U.S. at 21–22. Similarly, under the ADEA, "[a] work environment will be considered hostile if a reasonable person would have found it to be so and if the

plaintiff subjectively so perceived it" because of conduct based on the plaintiff's over-40 age. *Brennan*, 192 F.3d at 318; *see id*. ("an environment which is equally harsh . . . for both young and old does not constitute a hostile working environment under the [ADEA]").

As for the permissible temporal scope of a federal claim of employment discrimination, generally if the plaintiff has initially filed an administrative claim in a state whose laws prohibit such discrimination, the limitations period for filing an action is 300 days after the alleged unlawful practice. *See* 29 U.S.C. § 626(d)(1)(B). Where the plaintiff complains of discrete discriminatory or retaliatory acts such as "termination, failure to promote, denial of transfer, or refusal to hire," such claims are not actionable if they occurred prior to the 300-day period even though they may be "related to" acts that occurred within the permissible 300-day period. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–14 (2002) ("*Morgan*").

"Hostile environment claims," however, "are different in kind from discrete acts," as "[t]heir very nature involves repeated conduct." *Id*. at 115.

> The "unlawful employment practice" therefore cannot be said to occur on any particular day. *It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment*

*may not be actionable on its own. . . .* Such claims are based on the cumulative effect of individual acts.

*Id.* (emphasis added); *see, e.g., Harris*, 510 U.S. at 21. Thus, "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice *and at least one act falls within the time period*." *Morgan*, 536 U.S. at 122 (emphasis added); *see, e.g., id.* at 105 ("consideration of the entire scope of a hostile work environment claim, *including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability*, so long as *an* act contributing to that hostile environment takes place within the statutory time period" (emphases added)).

Moreover, even with respect to a claim of discrete discriminatory or retaliatory acts, expiration of the limitations period does not bar "an employee from using the prior acts as background evidence in support of a timely claim." *Id.* at 113. "[R]elevant background evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved, may be considered to assess liability on the timely alleged act." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176–77 (2d Cir. 2005); *see, e.g., Petrosino v. Bell Atlantic*, 385 F.3d 210, 220 (2d Cir. 2004).

In light of these principles, we conclude that the entirety of Garett's ADEA claim that she was subjected to a hostile work environment—being, from the start of her employment at Anthropologie, denied the training given to younger sales associates and relegated to work almost exclusively in the fitting room, and later being assigned the most unpleasant and arduous duties and subjected to age-disparaging criticisms daily—was timely. The district court erred in ruling that it could not consider pre–February 16, 2013 events in connection with assessment of liability on the hostile work environment claim and that it could not consider such events as background for her claim of retaliation.

B. *Principles Governing ADEA Retaliation Claims*

In the interest of "prevent[ing] employer interference with unfettered access to [statutory] remedial mechanisms," *White*, 548 U.S. at 68 (internal quotation marks omitted), the ADEA, like Title VII, prohibits "employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers," *id.* (discussing Title VII) (internal quotation marks omitted). Thus, the ADEA provides that

> [i]t shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d).

Prior to 2006, a plaintiff claiming retaliation for objecting to prohibited employment discrimination was required to present a prima facie case comprising four elements, *i.e.*, that (1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) the plaintiff suffered an adverse employment action, and (4) there was a causal connection between the protected activity and the adverse employment action. *See generally Kessler v. Westchester County Department of Social Services*, 461 F.3d 199, 204 (2d Cir. 2006) ("*Kessler*") (discussing Title VII and the ADEA). An "adverse employment action" in this context meant—as it did in the context of a substantive claim for discrimination, *see, e.g., Galabya*, 202 F.3d at 640—"a materially adverse change *in the terms and conditions of employment*" such as termination, demotion evidenced by a decrease in salary or wage, being given a less distinguished title, a material loss in benefits, significantly diminished material responsibilities, or some other action deleterious to the plaintiff's current or future

31

employment, *Kessler*, 461 F.3d at 204 (emphasis in *Kessler*; other emphasis and internal quotation marks omitted).

In 2006, however, the Supreme Court in *White* ruled that Title VII's "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment," 548 U.S. at 64.  Rather, a plaintiff may recover for retaliation by "show[ing] that a reasonable employee would have found the challenged action *materially adverse*, which in this context means *it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination*."  *Id*. at 68 (internal quotation marks omitted (emphases ours)).  The Court elaborated:

> We speak of *material* adversity because we believe it is important to separate significant from trivial harms. . . .
>
> We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective. . . .
>
> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. . . . A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But *to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the*

*employee's professional advancement might well deter a reasonable employee from complaining about discrimination*.

*Id*. at 68–69 (first two emphases in original; last emphasis added).

After *White*, therefore, the harm element of a retaliation claim is not to be analyzed in the same way as the harm from an alleged substantive act of discrimination. *See, e.g.*, *Kessler*, 461 F.3d at 207–10. "Prior decisions of this Circuit that limit unlawful retaliation to actions that affect the terms and conditions of employment, *e.g.*, . . . *Galabya* . . . , no longer represent the state of the law." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010). Instead, the proper question for a retaliation claim is "whether the [alleged adverse action] to which [the plaintiff] was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *Kessler*, 461 F.3d at 209; *see White*, 548 U.S. at 57 (whether the action "could well dissuade a reasonable worker from making or supporting a charge of discrimination").

In the present case, as discussed in Part I.D. above, the district court applied the standard used in *Galabya*, which involved a claim of substantive discrimination rather than one for retaliation, and which was decided some years

before the decision in *White*. In applying that pre-*White* substantive discrimination standard to the retaliation claims in the present case, the district court erred.

Anthropologie argues that the summary dismissal of Garett's retaliation claim should be affirmed notwithstanding the district court's application of the wrong standard for harm, on the basis that Garett failed to adduce sufficient evidence to show causation. We are unpersuaded. Although Anthropologie notes that the district court stated that "[t]here is no evidence that either one of [Garett's] managers was even aware that she had made a complaint to the Hotline at the time of her transfer," D. Ct. Op., 2017 WL 4326112, at *5, that statement cannot justify affirmance. First, "her transfer" must have referred to Garett's transfer to Greenwich: The court had refused to consider any events prior to mid-February (the period in which Garett was reassigned to White Plains), and Garett in fact was not transferred to Edgewater. But the record is clear that both Shearer and Berry were aware of Garett's complaint about Shearer before Garett was transferred to Greenwich. (*See*, *e.g.*, Shearer Dep. 78–84.)

Second, Anthropologie says that by "managers," the district court was instead referring to New Jersey district manager Ernst and Greenwich store manager

Orr; but the court's reference to "either one of [Garett's] managers" was unaccompanied by any names. And while Anthropologie argues that Ernst and Orr did not know of Garett's hotline complaints, we doubt that it was these two individuals to whom the district court referred since (a) Ernst was never Garett's manager, (b) Orr was not Garett's manager in Greenwich until after that transfer, and (c) we have not seen in the record any indication that either Ernst or Orr had the authority to transfer Garett.

To the extent that Anthropologie—arguing that the decision not to have Garett in Edgewater was made solely by New Jersey district manager Ernst (*see* Anthropologie brief on appeal at 9 n.9)—suggests that the court's statement referred instead to Garett's non-transfer to Edgewater, its argument is equally flawed. An inference can be drawn from the record that the decision that Garett should not go to Edgewater was made not by Ernst but by Shearer: Shearer testified that, in discussing the non-transfer decision with Garett, "I explained to her that *I* was really looking out for her best interests, . . . and *I* did not think that the Edgewater store was going to be" "a good experience" for her. (Shearer Dep. 82 (emphases added).) And a causal connection between the protected activity and the company's adverse employment

35

action can be established by showing that the employer's action followed the protected activity closely in time. *See, e.g., Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013); *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010) ("*Kaytor*"); *Kessler*, 461 F.3d at 210–11. Shearer testified that she gave the above explanation to Garett after the conversation in which Berry—manager of the region encompassing both Shearer's district and Edgewater—had called Shearer to discuss Garett's potential transfer to Edgewater and informed Shearer of Garett's hotline complaint about Shearer. Shearer testified that it was in that conversation that "the decision . . . that []Garett would not be transferred to the Edgewater store" was made. (Shearer Dep. 78–80.)

Finally, although Anthropologie proffers the Edgewater personnel problems (*see* Part I.B.2. above) as a legitimate business reason for denying Garett a transfer to that store, that explanation cannot be accepted as a basis for a judgment as a matter of law. For example, the representation that the decision not to have Garett in Edgewater was made by Ernst is in tension with Shearer's testimony that that decision was made in the telephone call between Shearer and Berry. Further, Ernst's statement that she did not offer and could not have offered Garett the apparel

36

supervisor position is disputed by Garett's testimony that Ernst did offer her the job.
And in any event, any problems in Edgewater do not provide a justification for
Shearer's telling Garett that she would be fired unless she agreed to be reassigned to
Greenwich, to a position already occupied, and for which she would be allowed to
do only the chores that were the most onerous.

C. *Principles Governing Decision of Summary Judgment Motions*

The principles governing a district court's consideration of a motion for
summary judgment—which also govern appellate review of a summary judgment
decision, *see, e.g., Kaytor*, 609 F.3d at 546—are well established.  In ruling on such a
motion, "the district court is required to resolve all ambiguities, and credit all factual
inferences that could rationally be drawn, in favor of the party opposing summary
judgment."  *Kessler*, 461 F.3d at 206 (internal quotation marks omitted).  "[A]t the
summary judgment stage the judge's function is not himself to weigh the evidence
and determine the truth of the matter but to determine whether there is a genuine
issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The court
should grant summary judgment only if there is no such issue and the moving party

is entitled to judgment as a matter of law. *See*, *e.g.*, *id*. at 247. Summary judgment should be denied where there are genuine issues of material fact "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. Summary judgment dismissing a claim "is inappropriate when the admissible materials in the record make it arguable that the claim has merit." *Kaytor*, 609 F.3d at 545 (internal quotation marks omitted).

In determining whether there are genuine issues of material fact to be tried, "the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'" *Id*. (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (reviewing entitlement to judgment as a matter of law under Fed. R. Civ. P. 50)); *see Reeves*, 530 U.S. at 150 ("the standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same," requiring the court to "review all of the evidence in the record" (internal quotation marks omitted)). Piecemeal review of the record "is especially [inappropriate] in considering claims of hostile work environment," *Kaytor*, 609 F.3d at 545, *i.e.*, an environment that, as discussed in Part II.A. above, "occurs over

a series of days or perhaps years" and has a "cumulative effect," *Morgan*, 536 U.S. at 115.

In reviewing "all of the evidence in the record," however, the court "*may not make credibility determinations or weigh the evidence,*" and it "must *draw all reasonable inferences in favor of the nonmoving party,*" *Reeves*, 530 U.S. at 150 (emphases added), "'even though contrary inferences might reasonably be drawn,'" *Jasco Tools, Inc. v. Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696 (1962)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150 (internal quotation marks omitted). However,

> although the court should review the record as a whole, *it must disregard all evidence favorable to the moving party that the jury is not required to believe. . . .* That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Id*. at 151 (internal quotation marks omitted (emphasis ours)).

In light of this well established framework, the district court, in considering Anthropologie's motion for summary judgment, was required to accept all sworn statements by Garett as to matters on which she was competent to testify, including what she did, what she observed, and what she was told by company managers; and it was required to draw in her favor all inferences that could reasonably be drawn from that evidence. It was required to disregard the contrary statements from Anthropologie managers that a jury would not be required to believe. Several aspects of the court's discussion, however, reveal either a piecemeal assessment of items in the record or a rejection of Garett's sworn statements.

For example, with regard to Garett's circumstances in White Plains, the court stated that any age-related remarks that Bentley or Fitzpatrick made to Garett "were occasional, isolated incidents," and were not sufficiently severe to support the claim of hostile work environment. D. Ct. Op., 2017 WL 4326112, at *4. But Garett said that immediately upon her promotion to apparel supervisor, Bentley became abusive, "treat[ing her] in a hostile and intimidating manner" (Garett Aff. ¶ 33); that the apparel manager Fitzpatrick, with whom Garett had had a positive working relationship—although she had not previously reported to Fitzpatrick (*see id*. ¶ 35;

Garett Dep. 129)—began to ignore Garett and then began to criticize her (*see* Garett Aff. ¶¶ 35–36); that Garett was excluded from management meetings, which were scheduled to coincide with her absences (*see id.* ¶ 35); that little more than a week after she became a supervisor (a position for which Garett, unlike younger employees, was given no training (*see id.*)), Bentley and Fitzpatrick berated her, saying that her performance was "terrible," that she was "the worst apparel supervisor that they had ever seen in their lives," that her "pace was too slow," that her "energy level" was too slow (*e.g.,* Garett Dep. 144–45); and that Fitzpatrick, sometimes in the presence of other employees, criticized Garett's "'speed'" and "'pace'" "almost daily" (Garett Aff. ¶ 36; *see* Garett Dep. 136–37).

If a jury accepts that testimony and credits Garett's testimony that Bentley in June told her explicitly "You're too old," and "You don't have the energy" and would not have "the stamina" to do the job, it could reasonably infer that all of the comments from Garett's managers that she was too slow or not fast enough or not energetic enough were euphemisms about her age. *Cf. Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 665 (2d Cir. 2009) ("a jury could conclude that the term 'energized' was a euphemism for youthful" (citing *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456–57

(2006))).  Viewing as a whole, rather than piecemeal, Garett's testimony as to her treatment and the statements made to her by Anthropologie managers, the jury could find that Garett—castigated, denied the training given to younger employees, and excluded from management meetings—was subjected to age-related discrimination, criticism, and ostracism nearly every day.

Similarly with respect to the retaliation claim, the district court appears not to have considered the record as a whole and plainly did not describe it in the light most favorable to Garett.  For example, the court rejected the claim of retaliation in part because Garett had been promoted to apparel supervisor.  It did not mention (a) that this, according to Garett, occurred only after she had complained of discrimination, and (b) that in her new position Garett was given no training and was criticized for being deficient; that the language used may permissibly be viewed as euphemistic disparagement of her age, and she was so criticized daily; and that she was promptly scheduled—more frequently than anyone had been in the past—to do those duties of the position that everyone disliked the most.

> Common sense suggests that one good way to discourage an employee . . . from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more

agreeable. That is presumably why the EEOC has consistently found "[r]etaliatory work assignments" to be a classic and "widely recognized" example of "forbidden retaliation."

*White*, 548 U.S. at 70–71 (quoting 2 EEOC 1991 Manual § 614.7, at 614-31 to 614-32).

The district court also opined that "[m]erely being transferred to a different location than one requested, *on its own*, does not constitute an adverse employment action." D. Ct. Op., 2017 WL 4326112, at *5 (emphasis added). The court did not mention, for example, Garett's testimony that she had in fact been offered the job she requested, only to have the offer countermanded upon Shearer's learning of Garett's complaint against her; that Garett was sent instead to a location in which the apparel supervisor position she sought was already filled; and that in that new location she was again denied training, was again relegated mostly to the fitting room, and was assigned to none of the apparel supervisor duties that were "easier or more agreeable" but only to those that were "more arduous," *White*, 548 U.S. at 71, *i.e.*, the chores of opening and closing the store, which "no one wants to do" (Garett Aff. ¶ 65).

Applying the correct legal standard to Garett's claim of retaliation, a jury could rationally find that an employee would likely be deterred from complaining to

the company or to governmental authorities about discrimination by her employer if she knew her complaint would result in (1) the rescission of a job reassignment offer she had sought and received, and (2) her transfer instead to a location that she had not sought, for a position that was not vacant, in which she would be denied all aspects of the reassigned position except those that "no one wants to do."

The "factfinder of course would not be required to draw inferences favorable to the plaintiff" or accept her testimony as credible; "however, where . . . the factfinder would be permitted to do so, this Court in reviewing summary judgment must do so," *Stern v. Trustees of Columbia University*, 131 F.3d 305, 313–14 (2d Cir. 1997), and has done so here. We conclude that Garett's ADEA claims of hostile work environment and retaliation should proceed to trial.

D. *Garett's State-Law Claims*

As the district court applied the same legal analyses to Garett's hostile work environment and retaliation claims under the NYSHRL and CFEPA that it applied under the ADEA, and the ADEA analyses were flawed, as discussed in Parts II.A. and B. above, we vacate the judgment dismissing those state-law claims as well.

Differences between the ADEA and those state laws may require additional consideration.

## CONCLUSION

We have considered all of Anthropologie's appellate arguments in support of summary judgment and have found them to be without merit. The judgment is vacated, and the matter is remanded for trial of Garett's ADEA claims of hostile work environment and retaliation, and for further consideration of her claims under state laws.